

# SUPREME COURT OF MISSOURI
# en banc

D. SAMUEL DOTSON III
AND REBECCA MORGAN,
     Plaintiffs,

v.

MISSOURI SECRETARY OF STATE
JASON KANDER,
     Defendant,

TOM DEMPSEY, TIMOTHY JONES,
RON RICHARD, KURT SCHAEFER
AND MISSOURIANS PROTECTING
THE 2ND AMENDMENT,
     Intervenors.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

No. SC94482

### ORIGINAL PROCEEDING: ELECTION CONTEST

*Opinion issued June 30, 2015*

PER CURIAM

     This case raises the issue of whether a challenge to the sufficiency and fairness of

a ballot title of a proposed measure may be brought after the measure was adopted by

voters. This Court holds that a post-election challenge to ballot titles can be brought

under chapter 115.[1]  As the ballot title was sufficient and fair, there was no irregularity in the August 5, 2014, election.[2]

## I.  Factual Background

Samuel Dotson and Rebecca Morgan challenge the sufficiency and fairness of the ballot title for a proposal modifying the right to bear arms in article I, section 23 of the constitution.  This is the second time these parties have come before this Court.  For a detailed recitation of the underlying facts, see *Dotson v. Kander*, 435 S.W.3d 643 (Mo. banc 2014) (*Dotson I*).  In *Dotson I*, this Court dismissed the pre-election challenge to the sufficiency and fairness of the ballot title as it was moot under section 115.125.2, RSMo Supp. 2013.  *Id.* at 645.  This statute states that "[n]o court shall have the authority to order an individual or issue be placed on the ballot less than six weeks" before an election.  The six-week date had already passed before the trial court resolved the merits. *Dotson I* noted that "judicial review of a claim that a given ballot title was unfair or insufficient (when not previously litigated and finally determined) is available in the context of an election contest should the proposal be adopted."  *Id.* at 645.

Senate Committee Substitute for Senate Joint Resolution 36 (SJR 36) was approved by voters in the August 5, 2014, primary election.  Plaintiffs have now filed an election contest in this Court to challenge the summary statement as an election irregularity pursuant to section 115.555.

---

[1] All statutory references are to RSMo 2000 unless otherwise noted.
[2]  This Court has jurisdiction to hear this case pursuant to Mo. CONST. art. VII, sec. 5 and section 115.555.  *See Gantt v. Brown*, 149 S.W. 644, 646 (Mo. banc 1912).

## II. Challenges to Ballot Titles

If the General Assembly writes the ballot title for a measure it proposes to voters, the title must be "a true and impartial statement of the purposes of the proposed measure in language neither intentionally argumentative nor likely to create prejudice either for or against the proposed measure." Section 116.155.2. The summary statement is limited to 50 words, excluding articles. *Id.*

Section 116.190, RSMo Supp. 2013, in relevant part, allows any citizen to challenge the official ballot title proposed by the General Assembly *before* an election takes place. The challenger must "state the reason or reasons why the summary statement portion of the official ballot title is insufficient or unfair." [3] Section 116.190.3. This section is a procedural safeguard that is "designed to assure that the desirability of the proposed amendment may be best judged by the people in the voting booth." *Buchanan v. Kirkpatrick*, 615 S.W.2d 6, 12 (Mo. banc 1981). Such challenges are necessary "to prevent a self-serving faction from imposing its will upon the people without their full realization of the effects." *See id.* at 11-12 (discussing a challenge to the ballot title of a citizen-proposed amendment). Judicial review of a ballot title is especially important in a legislature-proposed ballot initiative. This is true because the proponent of the initiative – the General Assembly – writes the ballot title as well as the

---

[3] Under section 116.155.2, the General Assembly is required to write a "true and impartial statement of the purposes of the proposed measure." In contrast, a citizen who challenges the ballot title must state why the summary statement is "insufficient or unfair" under section 116.190, RSMo Supp. 2013. While this Court has yet to examine in what ways these standards may differ, the challengers claim that the summary statement in SJR 36 was insufficient and unfair in that it did not meet the standards of section 116.155.

proposed amendment without any review of the ballot title by the executive department.[4]

*Compare* section 116.025, RSMo Supp. 2013, *with* section 116.155.

Pre-election review under section 116.190 can be an elusive remedy, however, if there is a relatively short period of time between when the ballot title is certified and when the election is to be held because courts are prohibited from adding issues to ballots within six weeks of an election. *See* section 115.125.2. *Dotson I* highlighted this problem: the *Dotson I* plaintiffs filed their suit on the same day the ballot title was certified, but the six-week deadline for changes prior to an election was 11 days later. *See Dotson I*, 435 S.W.3d at 644. Because the six-week period passed before the trial court issued a judgment, this Court determined that the case and the appeal were moot. *Id.* at 645. It was unlikely that both the trial court and appellate judicial review could have been completed within 11 days. *See also Cole v. Carnahan*, 272 S.W.3d 392, 395 (Mo. App. 2008). Because of the narrow window for judicial review, challengers, due to no delay on their part, were foreclosed from bringing their challenge. This scenario can happen when, as here, the governor places a legislative ballot proposal that was passed during the preceding legislative session on the August primary ballot.

In contrast to a *pre*-election challenge under section 116.190, chapter 115 allows registered voters to contest "[t]he result of *any* election on *any* question" *after* an election has been held. Section 115.553.2 (emphasis added). Chapter 115 provides guidelines for *post*-election challenges to election results for "irregularities" that occur during elections.

---

[4] In contrast, the ballot summary of a citizen-proposed initiative petition is written by the secretary of state and reviewed by the attorney general. *See* section 116.025, RSMo Supp. 2013.

*See, e.g.*, section 115.593.  This chapter endeavors to ensure that the results of each election are valid.

"Irregularity" is not defined in chapter 115, but courts have considered the violation of election statutes an irregularity that may be addressed in an election contest. *Gerrard v. Bd. of Election Comm'rs*, 913 S.W.2d 88, 89 (Mo. App. 1995); *see Marre v. Reed*, 775 S.W.2d 951 (Mo. banc 1989).  Additionally, section 116.020 states, in relevant part, that "[t]he election procedures contained in chapter 115 shall apply to elections on statewide ballot measures."  As a result, under section 116.020, a challenge to the ballot title of a proposed constitutional amendment may be brought as an irregularity in a post-election action under chapter 115, so long as the issue has not been previously litigated and determined. *Dotson I*, 435 S.W.3d at 645.

The state posits several reasons why the plaintiffs cannot challenge the ballot title in a chapter 115 post-election contest.  It first argues that chapter 116 is the exclusive means to challenge the ballot title of a proposed constitutional amendment.  Although chapter 116 provides a pre-election challenge to a ballot title, there is no statutory indication that it is the only vehicle for such a challenge.  In *Marre*, this Court held that a candidate for office could challenge the qualifications of certain voters in a post-election contest even though there were other statutes that outlined the procedures for pre-election challenges on this issue.  775 S.W.2d at 953; *see also United Gamefowl Breeders Ass'n of Mo. v. Nixon*, 19 S.W.3d 137, 139 (Mo. banc 2000) (rejecting argument that pre-election review under chapter 116 is the exclusive way to challenge an initiative measure); *Beatty v. Metro. St. Louis Sewer Dist.*, 700 S.W.2d 831, 838 (Mo. banc 1985)

5

("The wording of the proposition on a ballot and the propriety of the notice of election provided [in a special sewer district election] are issues cognizable only in an election contest.").

The state also argues that the specific timeline for filing a pre-election challenge in section 116.190 should control over the general election contest provisions in chapter 115, relying on *Knight v. Carnahan*, 282 S.W.3d 9, 20-21 (Mo. App. 2009). Reliance on *Knight* is misplaced as the issue there was whether the 10-day filing deadline in section 116.190 controlled over the filing deadline in sections 116.120 and 116.200. *Knight* does not purport to resolve whether a plaintiff may bring a section 116.190 claim under chapter 115. In fact, it notes that this is an open question. 282 S.W.3d at 15-16 (noting that *Cole*, 272 S.W.3d 392 "left open the question of what remedies might be available post-election based on an invalid ballot summary").

The state's next contention is that all the "irregularities" referenced in chapter 115 refer to conduct during an election, not the substance of the election provisions themselves. *See, e.g.*, section 115.053.3 (election deputies may "witness and report to the election authority any failure of duty, fraud or irregularity"); 115.107.2, RSMo Supp. 2013 ("Watchers are to observe the counting of the votes and present any complaint of irregularity or law violation"). In support, the state notes that chapter 115 contemplates a court taking evidence of an irregularity, as opposed to making a legal determination regarding the sufficiency and fairness of a ballot title. *See, e.g.*, section 115.561 (commissioners have authority to take depositions, compel attendance and take witness testimony, and compel discovery in election contest).

6

In this case, this Court appointed a commissioner to take evidence, and the parties submitted a joint stipulation of facts. While the plaintiffs did not present evidence of particular voters who were misled by the ballot title, this is not fatal to their claim under chapter 115. Rather, the plaintiffs in a post-election ballot title challenge are free to present the evidence they feel is most persuasive, a right available to every party in every case.

In sum, pre-election review under section 116.190 is *not* the exclusive vehicle to challenge the language of a ballot title. A challenge may be brought either before an election under chapter 116 or after an election under chapter 115 if the issue has not been previously litigated and determined. *See Dotson I*, 435 S.W.3d at 645.

### III. The Ballot Title Was Not an Irregularity

In cases in which challenges to the sufficiency of a ballot title are brought post-election, courts must determine if the ballot title met the requirements of chapter 116 as there can be no chapter 115 irregularity without an underlying chapter 116 violation of the sufficiency and fairness standard required for ballot titles.

To be sufficient and fair, "the summary statement must be adequate and state the consequences of the initiative without bias, prejudice, deception, or favoritism." *Brown v. Carnahan*, 370 S.W.3d 637, 654 (Mo. banc 2012). The General Assembly should endeavor to promote an informed understanding of the effects of the amendment, and the summary statement should accurately reflect both the legal and probable effects of the proposed initiative. *See id.* The summary statement should be fair and impartial so that voters will not be deceived or misled, but it is not necessary for the summary statement to

7

set out every detail of the proposal. *Id.* at 654, 656.

Courts have noted that, "[i]f charged with the task of preparing the summary statement for a ballot initiative, ten different writers would produce ten different versions." *Asher v. Carnahan*, 268 S.W.3d 427, 431 (Mo. App. 2008). As such, the test is not whether the ballot title, as written, was the best language, but whether the summary statement fairly and impartially summarizes the purpose of the initiative. *See id.*

SJR 36 proposed the following changes to Mo. Const. art. I, sec. 23 (new language in ***bold italics***, deleted language ~~struck through~~):

> That the right of every citizen to keep and bear arms**, *ammunition, and accessories typical to the normal function of such arms,*** in defense of his home, person**, *family*** and property, or when lawfully summoned in aid of the civil power, shall not be questioned~~; but this shall not justify the wearing of concealed weapons~~. **The rights guaranteed by this section shall be unalienable. Any restriction on these rights shall be subject to strict scrutiny and the state of Missouri shall be obligated to uphold these rights and shall under no circumstances decline to protect against their infringement. Nothing in this section shall be construed to prevent the general assembly from enacting general laws which limit the rights of convicted violent felons or those adjudicated by a court to be a danger to self or others as result of a mental disorder or mental infirmity.**

The summary statement of the ballot title asked voters:

> Shall the Missouri Constitution be amended to include a declaration that the right to keep and bear arms is a unalienable right and that the state government is obligated to uphold that right?

### A. *Provisions Not Addressed in the Summary Statement*

Plaintiffs first argue that the summary statement was insufficient and unfair in that

8

it omitted three key points of the amendment: (1) the application of strict scrutiny; (2) the deletion of the phrase "but this shall not justify the wearing of concealed weapons" from the provision; and (3) the addition of the protection to ammunition and accessories. Although the summary does not include every change in the proposal, these omissions do not render the ballot summary insufficient or unfair as they were not central features of the amendment. *See United Gamefowl Breeders*, 19 S.W.3d at 141 (the ballot summary need not set out all details of the proposal to be sufficient and fair); *Brown*, 370 S.W.3d at 656 (further clarifying amendment would make ballot summary more accurate but was not required).

### 1. Strict Scrutiny Provision

Plaintiffs argue that the summary statement was misleading for failing to disclose that the amendment would require courts to examine statutes affecting the right to bear arms under strict scrutiny. They contend that this is a "significant change" because neither the Supreme Court of the United States nor this Court has explicitly stated what level of scrutiny should apply to the right to bear arms. *See District of Columbia v. Heller*, 554 U.S. 570, 595, 628-29 (2008) (declaring the right to bear arms is a fundamental right but declining to specify a particular level of scrutiny); *State v. Richard*, 298 S.W.3d 529, 531-33 (Mo. banc 2009) (no particular level of scrutiny identified in analyzing a statutory prohibition against possessing a loaded firearm while intoxicated). This Court disagrees.

"Strict scrutiny" is a legal phrase of art grounded in decisions of the Supreme Court of the United States. It is used when legislation affects a fundamental right. *Etling*

9

*v. Westport Heating & Cooling Servs., Inc.*, 92 S.W.3d 771, 774 (Mo. banc 2003).

Considered the "most rigorous and exacting standard of constitutional review," strict scrutiny is generally satisfied only if the law at issue is "narrowly tailored to achieve a compelling interest." *Miller v. Johnson*, 515 U.S. 900, 920 (1995).

It is true that neither the Supreme Court of the United States nor this Court has delineated a level of scrutiny for the right to the bear arms. Furthermore, there is no settled analysis as to how strict scrutiny applies to laws affecting the fundamental right to bear arms, which has historically been interpreted to have accepted limitations. *Heller*, 554 U.S. at 626-27.

That strict scrutiny applies "says nothing about the ultimate validity of any particular law; that determination is the job of the court applying" the standard. *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 230 (1995). The nuances of how strict scrutiny applies depending on the right involved demonstrates that SJR 36 did not change the law affecting the right to bear arms but established a broader guideline indicating how laws affecting the right to bear arms should be scrutinized.[5]

---

[5] Even though SJR 36 set out strict scrutiny as the standard, that standard would already have been applicable to cases where the legislation was challenged based on article I, section 23 of the Missouri Constitution after *McDonald v. Chicago*, 561 U.S. 742 (2010). Although the Supreme Court of the United States did not announce a level of judicial scrutiny in *Heller*, it held in *McDonald* that the right to bear arms is a fundamental right that applies to the states. 561 U.S. at 791. Because this Court reviews laws affecting fundamental rights under the strict scrutiny standard, *Etling v. Westport Heating & Cooling Servs., Inc.*, 92 S.W.3d 771, 774 (Mo. banc 2003), strict scrutiny would have applied under the Missouri constitution had a challenge been made. By declaring the right to bear arms "unalienable" and imposing strict scrutiny, SJR 36 could be understood to be nothing more than a declaration of the law as it would have been declared by this Court after *McDonald* mandated that the fundamental right to bear arms applied to the states. The legislator-intervenors argue in their brief that "the declaration in the ballot measure that '[a]ny restriction on these rights shall be subject to strict scrutiny' was nothing

This is illustrated by other state courts that have upheld gun regulations under strict scrutiny. For example, Louisiana amended article I, section 11 of the Louisiana Constitution in 2012:

> The right of each citizen to keep and bear arms **is fundamental and** shall not be ~~abridged~~ **infringed.** ~~but this provision shall not prevent the passage of laws to prohibit the carrying of weapons concealed on the person.~~ **Any restriction on this right shall be subject to strict scrutiny.**

2012 La. Sess. Law Serv. Act 874 (S.B. 303) (West). In the wake of this amendment, the Louisiana Supreme Court recognized that "the right to bear arms has always been fundamental" and that the "stated intention" of the amendment was "to secure and protect Louisiana citizens' right to bear arms under the Louisiana Constitution from possible future judicial or legislative erosion." *State v. Eberhardt*, 145 So. 3d 377, 383 & n.3 (La. 2014).

Since the amendment was adopted, that court has applied a strict scrutiny test but upheld several laws regulating the possession of firearms, including a felon-in-possession law, a conceal-carry law, and a minor-in-possession law. *Id.* at 385 (applying strict scrutiny and upholding a felon-in-possession statute with a 10-year limit); *In re J.M.*, 144 So. 3d 853, 863, 866 (La. 2014) (applying strict scrutiny and upholding laws prohibiting carrying concealed weapons without a permit and prohibiting minors from possessing handguns in certain circumstances); *State v. Webb*, 144 So. 3d 971, 979, 983 (La. 2014) (applying strict scrutiny and upholding a law banning possession of a firearm while engaged in drug use and distribution); *State v. Draughter*, 130 So. 3d 855, 868 (La. 2013)

---

more than a declaration of the law as it clearly stood in the wake of *McDonald*." *Br. of Intervenors Kurt Schaefer and Missourians Protecting the 2nd Amendment*, at *23.

11

(applying strict scrutiny and upholding a felon-in-possession law as applied to offenders remaining under the supervision of the Louisiana department of corrections).

These cases, although not binding on this Court, demonstrate the addition of strict scrutiny to the constitution does not mean that laws regulating the right to bear arms are presumptively invalid as the dissent suggests. Sep. op. at 4. The right to bear arms "is not unlimited" and there are still "longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms."[6] *Heller*, 554 U.S. at 626-27.

### 2. Concealed Weapon Provision

Plaintiffs next argue that the summary statement needed to address the deletion of the phrase "but this shall not justify the wearing of concealed weapons" from article I, section 23. It was not necessary to include this deletion in the summary statement as the legislature continues to have the authority to regulate concealed weapons just as they did prior to the amendment. Deletion of this language clarified that the right to wear concealed weapons is subject to the same legislative restrictions that the General Assembly may place on the right to bear arms generally, which is consistent with this Court's previous interpretation of the deleted language:

[I]t means simply that the constitutional right does not extend

---

[6] The dissent argues that the addition of the phrase "[n]othing in this section shall be construed to prevent the general assembly from enacting general laws which limit the rights of convicted violent felons" will allow a *non*violent felon to have "the same individual state constitutional right to keep and bear arms as any other lifelong law-abiding citizen." Sep. op. at 10. The fact that violent felons are named does not necessarily increase the rights of nonviolent felons, a restriction clearly noted in *Heller*, 554 U.S. at 626-27.

12

> to the carrying of concealed weapons . . . [not] that the General Assembly is prohibited from enacting statutes allowing or disallowing the practice. . . .
>
> . . . .
>
> . . . [T]he General Assembly, which has plenary power to enact legislation on any subject in the absence of a constitutional prohibition, has the final say in the use and regulation of concealed weapons.

*Brooks v. State*, 128 S.W.3d 844, 847 (Mo. banc 2004) (citation omitted).

The dissent asserts that there is now an "open question" about whether article I, section 23 confers a right to wear concealed weapons. Sep. op. at 7. This Court's holding in *Brooks* that the legislature may regulate concealed weapons remains consistent with the text of article I, section 23. *See also Heller*, 554 U.S. at 626 (noting that, historically, the Second Amendment has not prohibited states from regulating concealed weapons). As this deletion did not change the current law regarding concealed weapon regulations, it did not need to be included in the summary statement.

### 3. Ammunition and Accessories Provision

Finally, the ballot title is not insufficient or unfair for failure to note the addition of language making it clear that the right established in article I, section 23, extends not only to guns but to ammunition and accessories as well, as "arms" could include ammunition. *See, e.g.*, WEBSTER'S THIRD NEW INT'L DICTIONARY 118 (1993) (defining "arms" as "a means of offense or defense: WEAPON"). Whatever practical difference the addition of the phrase "ammunition or accessories" may have, it is not so material that a failure to note this addition renders the ballot title insufficient or unfair. Additionally, this provision follows from *Heller*, which invalidated a law that required making a handgun

13

inoperable in the home.  554 U.S. at 635.

### B.  *Provisions Included in the Summary Statement*

Plaintiffs next argue that the ballot summary was misleading to voters by asking whether the constitution should be amended "to include a declaration that the right to keep and bear arms is a unalienable right and that the state government is obligated to uphold that right" because they contend the word "include" implies that the previous version of the constitution did not contain the right to bear arms and that the state was not previously obligated to uphold this right.  They rely on *Missouri Municipal League v. Carnahan*, 303 S.W.3d 573, 589 (Mo. App. 2010), in which the court of appeals found a ballot summary unfair when it asked, in relevant part, if the constitution should be restricted to require that the government pay a landowner just compensation if the government takes the landowner's property.  The court held this language implied just compensation was a new addition to the constitution when, in fact, it had always been required.  *Id.* at 588.

*Missouri Municipal League* is inapposite to this case, however, because the ballot title in SJR 36 does not imply that the constitution does not currently include a right to bear arms.  Rather, it asks whether the constitution should include a "declaration" and that the declaration will have two parts: (1) that the right to keep and bear arms is unalienable; and (2) that the government is obligated to uphold that right.  Before the amendment was adopted, there was no such declaration in the constitution.  As the ballot title asks whether the constitution should be amended to include these declarations, this was not misleading.  Additionally, it poses the question whether "the right" to keep and

14

bear arms should be declared unalienable. By using "the" before "right," the ballot title indicates it is amending a preexisting right.

Plaintiffs further argue that the ballot title misled voters by implying that the right to bear arms was not currently unalienable even though the constitution, at the time, stated the right to bear arms "shall not be questioned." They similarly contend the state was already obligated to uphold the right to bear arms, so this addition was unnecessary. These arguments fail because, as explained above, the central purpose of the amendment to article I, section 23, is not to change the right to bear arms, but to make certain "declarations" about that right. For that reason, the fact that this right is "fundamental" from a legal perspective does not mean that it is improper for the voters to add a declaration that the right is "unalienable." Similarly, the fact that the state always has had the obligation to uphold and protect this right together with the rest of the constitution does not mean that is improper for the voters to add a declaration that this is so.

## IV. Conclusion

Because the ballot title's description of the declarations added is sufficient and fair, plaintiffs have not shown an election irregularity under chapter 115.


Russell, C.J., Breckenridge and Wilson, JJ., concur;
Fischer, J., concurs in separate opinion filed;
Stith, J., concurs in result in separate opinion filed;
Teitelman, J., dissents in part and concurs in part in separate opinion filed;
Draper, J., concurs in part in opinion of Stith, J., and concurs in strict scrutiny analysis in opinion of Teitelman, J.



# SUPREME COURT OF MISSOURI
## en banc

D. SAMUEL DOTSON III )
AND REBECCA MORGAN, )
                 )
             Plaintiffs, )
                 )
v. )      No. SC94482
                 )
MISSOURI SECRETARY OF STATE )
JASON KANDER, )
                 )
             Defendant, )
                 )
TOM DEMPSEY, TIMOTHY JONES, )
RON RICHARD, KURT SCHAEFER, )
AND MISSOURIANS PROTECTING )
THE 2ND AMENDMENT, )
                 )
             Intervenors. )

## CONCURRING OPINION

I concur fully in the principal opinion. I write separately to emphasize that the purpose of the constitutional amendment (Senate Committee Substitute For Senate Joint Resolution 36 ("SJR 36")) was not to change the law but to make sure the Missouri Constitution is at least as protective as the Supreme Court of the United States has declared the law of the right to bear arms is under the Second Amendment to the United States Constitution. *McDonald v. City of Chicago, Ill.*, 561 U.S. 742 (2010); *District of Columbia v. Heller*, 554 U.S. 570 (2008). The ballot summary of SJR 36 sufficiently and

fairly described this purpose. *See* § 116.155.2, RSMo 2000 (An official summary statement for a constitutional amendment "shall be a true and impartial statement of **the purposes** of the proposed measure . . . .") (emphasis added). Statutes affecting the right to bear arms are not presumptively invalid as a result of SJR 36, as suggested by Judge Teitelman's dissenting opinion. Teitelman, J., dissenting op. at 4.

I.      **The Purpose of SJR 36 Was to Adopt *Heller* and *McDonald*, Federal Precedents that Currently Bind the States, as Missouri Law, Not to Change the Law**

In 2008, the Supreme Court of the United States held that the Second Amendment to the United States Constitution protects an individual's right to possess an operable handgun in the home for self-defense. *See Heller*, 554 U.S. at 635. The Supreme Court of the United States explained, "Under any of the standards of scrutiny that we have applied to enumerated constitutional rights, banning from the home the most preferred firearm in the nation to keep and use for protection of one's home and family would fail constitutional muster." *Id.* at 628-29 (footnote, citations, and internal quotation marks omitted). This right "is not unlimited." *Id.* at 626. "It is not a right to keep and carry any weapon whatsoever in any manner whatsoever and for any purpose whatsoever." *State v. Richard*, 298 S.W.3d 529, 534 (Mo. banc 2009) (Fischer, J., concurring); *Heller*, 554 U.S. at 626. *Heller* does not "cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms." *Heller*, 554 U.S. at 626-27. In 2010, the Supreme Court of the United States repeated many of these

2

points and held that the right to bear arms recognized in *Heller* is a right fundamental to our scheme of ordered liberty and fully applicable to the states through the Fourteenth Amendment. *McDonald*, 561 U.S. at 750, 767-68, 786, 791; *id* at 805-06 (Thomas, J., concurring in part and concurring in the judgment).

After *Heller* was decided but while *McDonald* was pending in the Supreme Court of the United States, this Court held that a statute prohibiting an intoxicated person from possessing a firearm was not facially unconstitutional or unconstitutional as applied under article I, section 23 of the Missouri Constitution. *Richard*, 298 S.W.3d at 531-33. The principal opinion of this Court held that it was not required to decide whether *Heller*'s interpretation of the Second Amendment applied to the states because the Supreme Court of the United States had not held that the Second Amendment applied to the states. *See id.* at 531.[1]

The stated purpose of SJR 36 was to make sure the Missouri protection of the right to bear arms matches the federal protection currently recognized in *Heller* and *McDonald*, should the Supreme Court of the United States later reinterpret the Second Amendment in a manner not originally intended. *See McDonald*, 561 U.S. at 803 (Scalia, J., concurring) (referring to the dissent's argument for a "living Constitution"). This is a legitimate concern for two reasons: (1) both *Heller* and *McDonald* were decided by a mere 5-4 majority; and (2) although Missouri constitutional provisions could be interpreted more expansively than comparable provisions of the United States

---

[1] *Cf. id.* at 533-34 (Fischer, J., concurring) (recognizing, before *McDonald* was decided, that the right to bear arms was a fundamental right that applied to the states based on the

3

Constitution, this Court uniformly, predictably, and preferably, in my view, interprets the Missouri mirror image constitutional provisions in lockstep with the United States Constitution. *See, e.g.*, *State v. Harris*, 414 S.W.3d 447, 449 (Mo. banc 2013) (ex post facto laws); *Doe v. Phillips*, 194 S.W.3d 833, 841 (Mo. banc 2006) (due process, equal protection, and ex post facto laws); *State v. Justus*, 205 S.W.3d 872, 878 (Mo. banc 2006) (confrontation); *State v. Pike*, 162 S.W.3d 464, 472 (Mo. banc 2005) (unreasonable searches and seizures); *State ex rel. Munn v. McKelvey*, 733 S.W.2d 765, 767 (Mo. banc 1987) (privilege against self-incrimination); *see also* Robert F. Williams, *The Law of American State Constitutions* 193-232 (2009).[2]

It was with this backdrop—a slim majority supporting the holdings in *Heller* and *McDonald* and few cases from this Court interpreting article I, section 23—that proponents of SJR 36 wanted to make sure that our state constitutional protection of the right to bear arms remains at least as protective as *Heller* and *McDonald*. The stated

---

incorporation doctrine).

[2] Not only did SJR 36 seek to protect the right to bear arms from potential erosion of the Second Amendment, it prevented Missouri courts from giving less effect to article I, section 23 than the Second Amendment. When SJR 36 was enacted, this Court had not issued an opinion declaring whether article I, section 23 of the Missouri Constitution would be interpreted in lockstep with *Heller* and *McDonald*. *See Richard*, 298 S.W.3d at 531-33. Although states must abide by the Supreme Court of the United States' interpretations of federal law, *see* U.S. Const. Art. VI, cl. 2, Missouri courts have the final say on how the Missouri Constitution is interpreted.

As the senator who sponsored SJR 36 and Missourians for the 2nd Amendment note in their brief to this Court (both being intervenors in this case), "[P]rior to the passage of the ballot measure this Court could conceivably have held the Missouri right to keep and bear arms to be a lesser right to the federal right explicated in *Heller* and *McDonald* (although it would certainly be an adventurous and unlikely speculation to predict that result)." *Br. of Intervenors Kurt Schaefer and Missourians Protecting the 2nd Amendment*, at *14. Although most cases would present the federal question because litigants have incentive to raise *McDonald*, individual rights can be waived in a particular case. *See, e.g.*, *Feldhaus v. State*, 311 S.W.3d 802, 804-05 (Mo. banc 2010) (due process). An interpretation of the Missouri Constitution giving less effect to the

4

purpose of the proponents of SJR 36 was to secure the individual right to bear arms from possible judicial or legislative erosion. The senator who sponsored SJR 36, along with Missourians Protecting the 2nd Amendment, stated the following in their brief to this Court:

> The clear purposes of SJR 36 are to bring the Missouri constitution in line with *Heller* and *McDonald*, to ensure that the Missouri right to keep and bear arms remains coextensive with the federal right explicated in *Heller* and *McDonald*, and to provide a prophylactic against legislative or judicial action that would violate *McDonald*. The method by which SJR 36 accomplishes these purposes is to make a declaration concerning how the existing right to keep and bear arms is to be regarded and secured in Missouri. Because it would be impossible (and fatally confusing) to concisely explain this purpose to voters in the summary statement, the legislature prepared the following summary statement:
>
> > Shall the Missouri Constitution be amended to include a declaration that the right to keep and bear arms is a[sic] unalienable right and that the state government is obligated to uphold that right?

*Br. of Intervenors Kurt Schaefer and Missourians Protecting the 2nd Amendment*, at *14 (footnote omitted).

In my view, the ballot language sufficiently and fairly summarized the purpose of incorporating into the Missouri Constitution the same protection of the right to bear arms as the Supreme Court of the United States recognized in *Heller* and *McDonald*. There is no indication that the proponents of SJR 36 intended the Missouri Constitution to be more expansive than the current declaration of the Second Amendment, nor is there any indication that it was intended to curtail the recognized limits on the possession of firearms by felons and the mentally ill, or on the carrying of firearms in sensitive places

right to bear arms than *Heller* and *McDonald* is exactly what SJR 36 sought to prevent.

such as schools and government buildings, or on commercial sales. *Heller*, 554 U.S. at 626-27; *Richard*, 298 S.W.3d at 534 (Fischer, J., concurring).

## II.  SJR 36's Various Declarations Align with *Heller* and *McDonald*

SJR 36 modified the text of article I, section 23 as follows: (1) it declared defense of "family" to be within the right to keep and bear arms; (2) it declared that the right to keep and bear arms does not prevent the General Assembly from limiting the rights of convicted violent felons or those adjudicated as dangerous mentally ill persons; (3) it declared the right to keep and bear "ammunition, and accessories typical to the normal function of such arms;" (4) it removed the phrase, "but this shall not justify the wearing of concealed weapons;" (5) it declared the right to keep and bear arms "unalienable;" and (6) it declared restrictions subject to "strict scrutiny."  These textual changes solidified the right to keep and bear arms as recognized in *Heller* and *McDonald* into the Missouri Constitution.

The first five modifications are clearly consistent with *Heller*.  The addition of "family" to the list flows straight from *Heller*.  554 U.S. at 628-29 (emphasizing protection of the home and family).  So too does the clarification that the General Assembly may limit rights of felons and dangerous mentally ill persons, as noted by the sponsoring senator and Missourians Protecting the 2nd Amendment in their brief to this Court.  *See id.* at 626-27 (recognizing longstanding prohibitions on the possession of firearms by felons and mentally ill persons); *Br. of Intervenors Kurt Schaefer and Missourians Protecting the 2nd Amendment*, at \*12.  The fact that *violent* felons are named does not increase the rights of nonviolent felons; the addition of "ammunition[]

6

and accessories typical to the normal function of such arms" follow from *Heller* because that case invalidated a law that required making a handgun inoperable in the home; deletion of the concealed weapon exception did not change the legislature's authority to regulate concealed weapons;[3] and "unalienable" is synonymous with "fundamental."

Judge Teitelman's dissenting opinion suggests that SJR 36's adoption of "strict scrutiny" raises questions about certain legislative restrictions on the right to bear arms that previously would have been permissible. Teitelman, J., dissenting op. at 4-7. SJR 36 did not change the law by adopting strict scrutiny.[4] As the principal opinion notes,

---

[3] The proponents of SJR 36 (the sponsoring senator, Missourians Protecting the 2nd Amendment, and three other legislators) take the position in this Court that removing the concealed weapon exception from article I, section 23 did not affect the legislature's authority to regulate concealed weapons.

*Br. of Intervenors Kurt Schaefer and Missourians Protecting the 2nd Amendment*, at *18-19: "There is no basis for this Court to hold that the authority of the legislature to regulate concealed weapons required or depended on an express enabling provision in the Missouri constitution. . . . There is nothing in the history of the right to keep and bear arms, the decisions of the [Supreme Court of the United States], or Missouri case law that in any way suggests that the authority of the legislature to regulate concealed weapons derives from, or in any way depends upon, any particular phrase in the state constitution. Now that the ballot measure has passed, Defendant presumes that this Court will follow every other court in the land in holding that the right to keep and bear arms does not prevent the legislature from regulating concealed weapons."

*Br. of Intervenors Tom Dempsey, Timothy Jones, and Ron Richard*, at *32-33 (citations omitted): "The implication [of plaintiffs' argument] is that the legislature has no authority to regulate concealed weapons absent an enabling phrase in the constitution. This is untrue. The right to keep and bear arms includes 'certain well-recognized exceptions.' . . . Plaintiffs offer no support for their speculation that the legislature cannot regulate concealed weapons absent an express grant of authority in the Missouri constitution. Intervenors presume that now that the Amendment has passed, this Court would follow every other court in holding that the right to keep and bear arms does not prevent the legislature from regulating concealed weapons. Not only is the repeal of this language a mere detail, but a probable effect of such repeal is not a change to Missouri's conceal carry laws."

[4] While this Court presumes constitutional language is not meaningless, *Buechner v. Bond*, 650 S.W.2d 611, 613 (Mo. banc 1983), a declaration of existing law is not a meaningless act. Although it is this Court's province and duty to say what the law is, *see Marbury v. Madison*, 5 U.S. 137, 177 (1803), the People of the State of Missouri are ultimately sovereign concerning matters of state law, *see* Mo. Const. art. I, § 1.

because the right to bear arms has been declared a fundamental right by the Supreme Court of the United States in *McDonald*, this Court would have applied strict scrutiny regardless of SJR 36.  *See* Slip op. at 10 n.5.  The principal opinion is clear that this Court's precedent supports applying strict scrutiny once *McDonald* declared the right to bear arms a fundamental right and applied the Second Amendment to the states through the Fourteenth Amendment.[5]

Judge Teitelman's dissenting opinion also claims that legislative restrictions on the right to bear arms are now presumptively invalid as a result of the adoption of strict scrutiny.  Teitelman, J., dissenting op. at 4.  This stands at odds with the well-settled legal standard for constitutional challenges: "A statute is presumed valid and will be declared unconstitutional only if the challenger proves the statute 'clearly and undoubtedly violates the constitution[] . . . .'"  *Lewellen v. Franklin*, 441 S.W.3d 136, 143 (Mo. banc 2014).

Furthermore, application of the "strict scrutiny" test varies depending on the type of right involved and the particulars of the law at issue.  It does not mean the legislation at issue is deemed unconstitutional.  "Courts routinely uphold laws when applying strict scrutiny, and they do so in every major area of the law . . . ."  Adam Winkler, *Fatal in Theory and Strict in Fact: An Empirical Analysis of Strict Scrutiny in the Federal Courts*, 59 VAND. L. REV. 793, 795-96 (2006) (finding, in a study of all published federal court applications of strict scrutiny over a span of 13 years, that laws survived strict scrutiny 30% of the time).  More importantly, "strict scrutiny" is applied differently depending on

---

[5]  "The nuances of how strict scrutiny applies depending on the right involved demonstrates that SJR 36 did not change the law affecting the right to bear arms . . . ."  Slip op. at 10.

the right involved. *See id.* at 796-97 (finding that courts upheld laws more often in religious liberty cases than in cases involving suspect class discrimination, free speech, freedom of association, and other fundamental rights). Strict scrutiny has no settled meaning as applied to the right to bear arms, which the Supreme Court of the United States has declared a "[]limited" fundamental right. *Heller*, 554 U.S. at 595, 626.

The four Louisiana Supreme Court cases cited by the principal opinion make clear that a law is not presumptively invalid just because strict scrutiny applies. The People of the State of Louisiana also saw the wisdom in making sure their state constitution would be interpreted in accordance with *Heller* and *McDonald*. The ballot language for the Louisiana amendment was as follows: "Do you support an amendment to the Constitution of the State of Louisiana to provide that the right to keep and bear arms is a fundamental right and any restriction of that right requires the highest standard of review by a court? (Amends Article I, Section 11)." 2012 La. Sess. Law Serv. Act 874 (S.B. 303) (West). The text of the amendment adopted strict scrutiny, and in applying that test, the Louisiana Supreme Court has upheld several laws affecting the right to bear arms, concluding as follows:

> [T]he voters' ratification of strict scrutiny as a review standard of alleged infringements on the right to keep and bear arms was not meant to invalidate every restriction on firearms, whether in existence at the time the amendment was ratified or yet to be enacted. Rather, the strict scrutiny standard adopted by the voters "is designed to provide a framework for carefully examining the importance and sincerity of the reasons advanced by the governmental decisionmaker" for firearm regulation within the context of the fundamental right to keep and bear arms. *Grutter v. Bollinger*, 539 U.S. 306, 327 (2003). . . . Strict scrutiny requires a careful examination by our courts, keeping in mind that the fundamental right at issue is one where some degree of regulation is likely to be necessary to

9

protect the public safety.  *Grutter*, 539 U.S. at 327 (in a strict scrutiny analysis, "context matters.").

*State in the Interest of J.M.*, 144 So. 3d 853, 860 (La. 2014) (citations omitted).

## Conclusion

The purpose of SJR 36 was simply to lock in time for purposes of the Missouri Constitution the right to bear arms as declared and set out in the Supreme Court of the United States' decisions in *Heller* and *McDonald*.  The ballot language gave the People a sufficient and fair summary when they voted to pass SJR 36.  Therefore, I concur in the principal opinion.

_____
Zel M. Fischer, Judge


| | |
|---|---|
| D. SAMUEL DOTSON III<br>AND REBECCA MORGAN, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) |
| MISSOURI SECRETARY OF STATE<br>JASON KANDER, | ) |
| | ) |
| | )    No. SC94482 |
| Defendant, | ) |
| | ) |
| TOM DEMPSEY, TIMOTHY JONES,<br>RON RICHARD, KURT SCHAEFER<br>AND MISSOURIANS PROTECTING<br>THE 2ND AMENDMENT, | ) |
| | ) |
| Intervenors. | ) |

## *OPINION CONCURRING IN RESULT*

I respectfully disagree in part with the reasoning used by the principal opinion in analyzing whether the changes in article I, section 23 of the Missouri Constitution relating to felons in possession of firearms and strict scrutiny were required to be included in the ballot title for that title to be fair and sufficient. Even more fundamentally, I disagree with this Court's construction of chapter 115, RSMo, to apply to post-election challenges to the ballot title. Ballot title errors are not "irregularities" in

an election as contemplated by chapter 115 and can be brought only prior to an election under chapter 116, RSMo. But I nonetheless conclude that, under law of the case principles, these petitioners should be permitted to raise the challenge under chapter 115. They timely brought a chapter 116 challenge; it was this Court that erred in dismissing it based on mootness in *Dotson v. Kander, 435 S.W.3d 643 (Mo. banc 2014) (Dotson I)*. Reaching the merits, this Court should void the result of an election only if it cannot avoid doing so. Because the amendment can be interpreted not to change the law regarding possession of arms by felons, and because the reference to strict scrutiny can be interpreted to be used in its lay sense rather than as a legal term of art, I concur in result.

## I. STRICT SCRUTINY AND OTHER CHANGES TO MISSOURI'S RIGHT TO BEAR ARMS CONSTITUTIONAL PROVISION

This is a challenge to the ballot title of a measure proposing modifications to Mo. Const., art. I, sec. 23, what is popularly known as the "right to bear arms" amendment. Prior to the amendment to article I, section 23 adopted by the people in August 2014, that section stated:

> That the right of every citizen to keep and bear arms in defense of his home, person and property, or when lawfully summoned in aid of the civil power, shall not be questioned; but this shall not justify the wearing of concealed weapons.

SJR 36 proposed an amendment to article I, section 23, which was adopted by the people in August 2014. As amended, article I, section 23 states (new language in bold, deleted language struck through):

> That the right of every citizen to keep and bear arms**, ammunition, and accessories typical to the normal function of such arms,** in defense of his home, person, **family** and property, or when lawfully summoned in aid of

2

the civil power, shall not be questioned~~; but this shall not justify the wearing of concealed weapons~~. **The rights guaranteed by this section shall be unalienable. Any restriction on these rights shall be subject to strict scrutiny and the state of Missouri shall be obligated to uphold these rights and shall under no circumstances decline to protect against their infringement. Nothing in this section shall be construed to prevent the general assembly from enacting general laws which limit the rights of convicted violent felons or those adjudicated by a court to be a danger to self or others as result of a mental disorder or mental infirmity.**

The legislature prepared the ballot title for SJR 36, and that ballot title is what voters saw in the voting booth as they voted whether to adopt the proposed amendment to that section. As the principal opinion recognizes, section 116.155.2[1] provides that where, as here, the legislature prepares the ballot title for a proposed constitutional amendment:

> 2. The official summary statement approved by the general assembly shall, taken together with the approved fiscal note summary, be the official ballot title and such summary statement shall contain no more than fifty words, excluding articles. *The title shall be a true and impartial statement of the purposes of the proposed measure in language neither intentionally argumentative nor likely to create prejudice either for or against the proposed measure.*

(Emphasis added).

The summary statement of the ballot title for SJR 36 asked voters:

> Shall the Missouri Constitution be amended to include a declaration that the right to keep and bear arms is a [sic] unalienable right and that the state government is obligated to uphold that right?

Section 116.190.1, RSMo Supp. 2013, provides that any citizen may challenge a ballot title if the challenger does not believe that the ballot title sufficiently and fairly sets

---

[1] All statutory references are to RSMo 2000 unless otherwise noted.

3

out the changes that would result were the constitutional amendment adopted.[2] Does the ballot title provided by the legislature summarizing the changes to article I, section 23, sufficiently and fairly set out a true and impartial statement of the purposes of the proposed measure in the manner required by section 116.155.2? The petitioners say it does not.

First, the petitioners point to the amendment's deletion of language in the prior version of article I, section 23, stating that the right to bear arms "shall not justify the wearing of concealed weapons." I agree with the principal opinion that, in *Brooks v. State, 128 S.W.3d 844, 847 (Mo. banc 2004)*, this Court held that the clause in the former article I, section 23 addressing concealed weapons simply clarified that article I, section 23 was not intended to affect the legislature's authority to regulate the carrying of concealed weapons. As the prior wording of article I, section 23, therefore, neither conferred nor took away a Missourian's right to carry concealed weapons, and as the recently adopted amendment likewise neither confers nor takes away such a right, the removal of the concealed weapons clause did not affect the right of the legislature to

---

[2]Section 116.190.1 states:
  1. Any citizen who wishes to challenge the official ballot title or the fiscal note prepared for a proposed constitutional amendment submitted by the general assembly, by initiative petition, or by constitutional convention, or for a statutory initiative or referendum measure, may bring an action *in the circuit court of Cole County. The action must be brought within ten days after the official ballot title is certified by the secretary of state in accordance with the provisions of this chapter.*
  (Emphasis added.)

4

regulate the wearing of concealed weapons, and so its omission from the ballot title did not make the title unfair or insufficient.

The petitioners also assert that the addition to article I, section 23 of protections of ammunition and accessories to arms is a substantial change in the law. While the purpose of adding these protections is somewhat perplexing – had any legislature been directing how gun holsters could be worn and what type of ammunition should be purchased? – that does not mean that the addition of this language necessarily worked a substantial change in the law. Its effect depends on its interpretation. If, for instance, this language were read as guaranteeing the right to unregulated possession of any form of ammunition or accessory, however dangerous to the public or law enforcement, then clearly it would work a substantial change in the law and the ballot title would not be fair and sufficient.[3] But so long as this language is interpreted, as I would interpret it, simply to allow Missourians reasonable access to bullets and accessories, they always have had such access. So, by finding the ballot title language fair and sufficient, the Court necessarily is holding that this language – much like the now deleted language about concealed weapons – is to be interpreted narrowly.

For similar reasons, I would not invalidate the ballot title due to the otherwise rather inexplicable omission from that title of language noting that the amendment adds

---

[3] In *District of Columbia v. Heller, 554 U.S. 570, 627 (2008)*, the United States Supreme Court said, "We also recognize another important limitation on the right to keep and carry arms. *Miller* said, as we have explained, that the sorts of weapons protected were those 'in common use at the time.' 30 U.S., at 179, 59 S.Ct. 816. We think that limitation is fairly supported by the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.'"

5

language expressly stating that the amendment does not prevent the legislature from regulating the right to bear arms "of convicted violent felons or those adjudicated by a court to be a danger to self or others as a result of a mental disorder or mental infirmity."

Intervenors Kurt Schaefer and Missourians Protecting the 2nd Amendment argued in their brief that the legislature intended the amendment not to change the law regarding the Second Amendment but, rather, to ensure that Missouri Second Amendment law is consistent with federal Second Amendment law as set out in *District of Columbia v. Heller, 554 U.S. 570, 626-27 (2008)*, and *McDonald v. City of Chicago, Ill., 561 U.S. 742 (2010)*. In *McDonald*, the United States Supreme Court explained that the Second Amendment's protection of the fundamental right to bear arms applies to the states. In *Heller*, it held that even though the Second Amendment simply states, "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed," the states nonetheless have traditionally enjoyed the right to regulate the possession of firearms in reasonable ways, including the right of felons to possess firearms. *Heller, 554 U.S. at 626*.

This reasoning applies here. Judge Teitelman is incorrect in suggesting in his dissenting opinion that the failure of article I, section 23, as amended, to mention the right to regulate nonviolent felons means that the amendment removed from the legislature its traditional authority to regulate the possession of weapons by all felons or those with mental conditions that make them a danger to themselves or others. Were he correct, then I would agree with him that this was a substantial change in the law, and that a ballot title that does not reflect that change would be unfair and insufficient.

6

But the amendment's silence is just that – silence.  It affirmatively bars nothing.  In that sense, it is similar to the language included in the previous version of article I, section 23, stating that the amendment did not justify the carrying of concealed weapons.  This Court held in *Brooks* that this language simply said what article I, section 23 *did not do*; while perhaps superfluous, it in no way limited the authority of the legislature to regulate concealed weapons.  Removing it from article I, section 23, therefore, had no effect on the legislature's authority in this area.

Similarly, here, the express recognition in the amendment that the legislature may regulate the possession of arms by violent felons does not affirmatively prohibit the legislature from regulating the possession of arms by other felons.  While perhaps again superfluous, it makes no substantive change in the legislature's authority, because adding a mention of one type of permissible regulation does not, thereby, make all other types of regulation impermissible.  As such, the failure to include a description of this "change" as to the specific mention of the lack of a right of violent felons to bear arms in the ballot title did not render the latter unfair or insufficient.

But, for these same reasons, clarification is required regarding the principal opinion's holding that the addition of the "strict scrutiny" clause to article I, section 23 does not work a substantial change in Missouri law governing review of the right to bear arms.  Were Judge Teitelman correct that strict scrutiny has only a single, required meaning when considering regulation of fundamental rights – that is, the law at issue must be narrowly tailored to achieve a compelling governmental interest to survive strict scrutiny – then the amendment would work a substantial change in Missouri law and he

7

would be correct that the summary statement is unfair and insufficient. For both Missouri and the United States Supreme Court have avoided using or requiring other courts to use a particular type of scrutiny when examining regulation of fundamental rights, including the right to bear arms. *Heller* and *McDonald* in particular recognize the right to bear arms as fundamental yet studiously avoid stating what type of scrutiny applies, finding that such categorization was not necessary to its analysis. *Heller, 554 U.S. at 628-29, 634-35*; *see McDonald, 561 U.S. at 782-84*. Instead, *Heller* simply states: "Under any of the standards of scrutiny that we have applied to enumerated constitutional rights, banning from the home the most preferred firearm in the nation to keep and use for protection of one's home and family, would fail constitutional muster." *554 U.S. at 628-29* (internal citation and quotation marks omitted).[4] Similarly, as the concurring opinion of Judge Fischer notes, this Court to date has not expressly set out any specific standard of review. I disagree, however, with Judge Fischer's further statement that Missouri law requires that strict scrutiny be applied once the right to bear arms is recognized as a fundamental right. To the extent that the principal opinion can be read to

---

[4] But as the dissenting opinion of Justice Breyer in *Heller* notes, the *Heller* majority "implicitly, and appropriately, rejects that suggestion by broadly approving a set of laws – prohibitions on concealed weapons, forfeiture by criminals of the Second Amendment right, prohibitions on firearms in certain locales, and governmental regulation of commercial firearm sales – whose constitutionality under a strict scrutiny standard would be far from clear." *554 U.S. at 688* (Breyer, J., dissenting). In other words, by approving such traditional restrictions without subjecting them to an analysis under strict scrutiny, the majority implicitly rejected the application of strict scrutiny to such traditional regulations.

8

so hold (it is ambiguous on this point), I disagree with it also. I would instead follow the approach taken by the United States Supreme Court in *Heller* and *McDonald*.

The United States Supreme Court has taken a similar approach when analyzing the regulation of the right to marriage. In *Zablocki v. Redhail, 434 U.S. 374 (1978)*, the Supreme Court recognized a fundamental right to marriage but did not use the label "strict scrutiny" in analyzing the law at issue. Instead, *Zablocki* simply stated it would apply a different analysis – the law "cannot be upheld unless it is supported by sufficiently important state interests and is closely tailored to effectuate only those interests." *434 U.S. at 388*.

The lesson from these cases is that scrutiny of whatever type is simply a means of determining constitutional validity – the test is not an end in itself, just a means. In the context of examining fundamental rights (as opposed to in the analysis of cases involving a suspect class), use of the term "strict scrutiny" is more confusing than helpful, so the Supreme Court is moving to avoid labels and instead simply analyze whether sufficiently important state interests justify the regulation in question.

There is no reason to interpret the term "strict scrutiny" in the recently adopted amendment to require utilization of a technical legal standard that even the United States Supreme Court does not apply to regulation of the Second Amendment – indeed, the proponents of the amendment state that their intent was to match Missouri law to federal protections of the right to bear arms, not to go beyond federal law. Nothing in the ballot

9

summary or the amendment itself states that the term is intended to have a strict or technical legal meaning, and certainly it never explains this meaning to the public.[5]

Further, to the extent that the amendment could be read to intend to impose a set definition of "strict scrutiny" that does not fit with the common law right of judges to interpret the constitution – and that is inconsistent with *Heller*, which specifically chose not to accept the invitation to adopt strict scrutiny[6] – it would impinge on the judicial province and so raise serious separation of powers issues. Would the legislature next be able to tell the courts that they may not review legislation at all, or propose a constitutional amendment so providing? The answer clearly is no.

All of these concerns disappear, however, when one recognizes that those who wrote the ballot title said that it was not intended to change the current state of the law regarding the right to carry or to regulate concealed weapons but was intended only to codify that law. This is inconsistent with interpreting the words "strict scrutiny" as being used in a particular and changing legal sense, or as requiring a particular level of scrutiny, for, as the principal opinion notes, no specific level of scrutiny has been applied to analysis of the right to bear arms, so imposition of a particular level of scrutiny would be a substantial change in the law.

_____

[5] Moreover, to hold otherwise would require this Court to rethink its holding that the failure to mention regulation of the possession of concealed weapons, or the possession of weapons by nonviolent felons, was not a substantial change that should have been mentioned in the ballot summary, for while there might be a compelling reason for such regulations, it is a far closer question whether there was no less-restrictive alternative. Would courts have to get into the nitty-gritty of whether it would meet any compelling state interest in the safety of its citizens to limit civilians' possession of nuclear or chemical weapon? But would the same apply to bazookas?

[6] *See, e.g., Heller, 554 U.S. at 628-29* (declining to adopt any particular level of scrutiny).

In other words, were the ballot language interpreted to try to constrict how this Court applies its own common law methods of review of cases, a supremely and exclusively judicial function, and to prohibit any regulation when a less restrictive alternative might be sufficient, then the ballot title would be unfair and insufficient because, at a minimum, these words would work a substantial change in the law, both federal and state.

In the absence of a clear statement that the word is used in its technical sense, it is appropriate to conclude, therefore, that it was intended to be used constitutionally and in its common and everyday lay sense, the sense that voters would understand the words to have when they voted for or against the amendment. *See, e.g., Missouri Prosecuting Attorneys v. Barton Cnty, 311 S.W.3d 737, 741 (Mo. banc 2010)* ("In determining the meaning of a constitutional provision the court must first undertake to ascribe to the words the meaning which the people understood them to have when the provision was adopted").

Webster's Third New International Dictionary defines "scrutiny" as "a searching study or inquiry," and "strict" as "particularly severe in requirement." *Webster's Third New International Dictionary of the English Language 2043, 2261 (3d ed. 1993).* The words "strict scrutiny" to the lay voter, therefore, simply mean that the courts are to carefully and severely scrutinize any attempt to regulate the right to bear arms. As that right has long been recognized by this Court as fundamental, and as this is consistent with the test applied in *Heller*, these words effect no change in this Court's approach to regulation of the right to bear arms. Therefore, precisely because the words are used in

11

their normal lay sense, this change also was not required to be included in the ballot title in order for it to be fair and sufficient. It is not clear to me whether the principal opinion's somewhat convoluted discussion of the "strict scrutiny" issue is in agreement or disagreement with what I say here, but to the extent it is in disagreement, I dissent.

## II.    *CHAPTER 115 DOES NOT APPLY TO BALLOT TITLE CHALLENGES*

Unlike the principal opinion, I would not reach the above challenges to the ballot title by analyzing that ballot title under chapter 115 of the Missouri statutes. Chapter 115 governs challenges to election irregularities, not challenges to ballot titles. Chapter 116 is the chapter that governs challenges to ballot titles. There is no reason for this Court to create a novel second method of attacking ballot titles, as the principal opinion does here, simply because this Court erroneously dismissed the petitioner's pre-election challenge properly brought under chapter 116.

The simpler, and more appropriate, approach is to recognize that this Court's prior decision in *Dotson I* was incorrect in dismissing the pre-election challenge as moot. While, as *Dotson I* notes, within six weeks of an election it is too late to change a ballot title, this does not mean it is not too late to consider whether the ballot title language complies with chapter 116's requirements. Indeed, this very lawsuit shows that it is not too late to do so. But why require usage of the artificial mechanism of a second suit under a different chapter, chapter 115, that this Court without citation to anything in chapter 115 or 116 themselves finds incorporates chapter 116? Why not just proceed on the initial chapter 116 petition?

### A.  Chapter 116, not Chapter 115, Governs Ballot Title Challenges

Section 116.190.1 provides that any challenge to a ballot title must be brought in Cole County and must be brought within 10 days of certification of the ballot title by the Missouri secretary of state:

> 116.190. 1. Any citizen who wishes to challenge the official ballot title or the fiscal note prepared for a proposed constitutional amendment submitted by the general assembly, by initiative petition, or by constitutional convention, or for a statutory initiative or referendum measure, may bring an action in the circuit court of Cole County. The action must be brought within ten days after the official ballot title is certified by the secretary of state in accordance with the provisions of this chapter.

These requirements are simple, direct, and easy to comply with and understand. In fact, these very plaintiffs did just that by bringing an action under section 116.190 in Cole County within 10 days of the certification of the ballot title by the Missouri secretary of state. *Dotson I, 435 S.W.3d at 643.*

But section 115.125.2, RSMo Supp. 2013, provides that "[n]o court shall have the authority to order an individual or issue be placed on the ballot less than six weeks before the date of the election." Although the petitioners filed their challenge to the ballot title on the very day it was certified, that was insufficient time for them to litigate the issue of the ballot title's sufficiency and fairness, because the certification occurred only six weeks and 11 days prior to the August primary ballot on which the proposition was to appear. This 11-day window had expired before the trial court even ruled on the challenge, much less before this Court could consider the matter on appeal. This Court, therefore, held that the language of section 115.125.2 "prohibit[ed] court-ordered

13

modifications to a ballot title within six weeks of an election." *Dotson I, 435 S.W.3d at 645.* To that point, the decision was correct.

But *Dotson I* further held that the challenge to the ballot title, therefore, was moot because the amendment could not be removed from the ballot before the election. Nothing in chapter 116, however, says that its procedures become moot six weeks before an election. *Knight v. Carnahan, 282 S.W.3d 9 (Mo. App. 2009)*, holds to the contrary.

In *Knight*, as here, petitioners challenged the secretary of state's certification of a statewide ballot measure, arguing that it encompassed more than one subject and should be removed from the ballot and asking that the measure be held legally insufficient. The trial court rejected the challenge. The court of appeals was unable to hear and determine the appeal of that ruling until after the election had occurred. The court of appeals held that, because the election already had occurred, the request for an injunction was moot. *Id. at 15-17*. But *Knight* went on to determine the claim that the measure was invalid because it concerned more than one subject matter and rejected it on the merits under chapter 116. This then, is a challenge brought pre-election but determined post-election, under chapter 116. *Id.*

*Knight* remains good law. Its approach should have been applied by this Court in *Dotson I*, which should have held that, while the attempt to prevent a vote on SJR 36 was moot, the challenge to the sufficiency of the ballot title language was not.

Because of its failure to recognize that the chapter 116 proceeding could continue even after it was too late to change the ballot title language before the election, *Dotson I* was in a quandary because of the unfairness of precluding review of the ballot title

14

despite the bringing of a timely challenge to its language. This caused this Court to soften the blow by speculating in dicta that the mooting of the chapter 116 challenge did not preclude any review of the ballot title:

> [I]n light of the fact that judicial review of a claim that a given ballot title was unfair or insufficient (when not previously litigated and finally determined) is available in the context of an election contest should the proposal be adopted. *See* section 115.555, RSMo 2000.

*Dotson I, 435 S.W.3d at 645.* No case was cited as authority for this statement, nor was section 115.555 quoted to show what portion of that section supported that result, and with good reason. Nothing in section 115.555 or in any case interpreting or applying it holds that ballot title sufficiency and fairness can be litigated as part of a challenge to election irregularities under section 115.555.

As just quoted, section 116.190 is quite specific: A ballot title challenge must be brought within 10 days of certification of a matter for the ballot. The statute does not provide that, alternatively, such a challenge may be brought after the election under chapter 115. Held hostage by its previous dicta, however, the principal opinion holds that, because this Court dismissed the prior suit as moot, it would henceforth treat ballot title insufficiencies as if they were a form of "irregularity" in the holding of an election, because suit may be brought after an election to challenge election "irregularities." No prior case, however, states that ballot title insufficiency is an election irregularity.

This is because, as the very structure of chapter 115 demonstrates, that chapter is intended as a mechanism for voters to "contest the result of any election on any question" after an election. *§ 115.553.2.* That is, it provides a remedy when the way the election

15

was held was improper and allegedly affected the election result. So, for example, section 115.537 provides that, not later than five days after the election contest petition is filed, "a preliminary hearing shall be held to determine whether there shall be a recount and not to determine what the recount would show. The court shall hear all evidence by the contestant and contestee bearing on the alleged irregularities." Section 115.553.2 provides:

> The result of any election on any question may be contested by one or more registered voters from the area in which the election was held. The petitioning voter or voters shall be considered the contestant and the officer or election authority responsible for issuing the statement setting forth the result of the election shall be considered the contestee.

But, in a ballot title case, the petitioner does not contest the result of the election, but the wording of the ballot title. Similarly, section 115.557 provides that persons who wish to contest the election:

> [O]n any question provided in section 115.555, shall file a verified petition in the office of the clerk of the supreme court. The petition shall set forth the points on which the contestant wishes to contest the election and the facts he will prove in support of such points, and shall pray leave to produce his proof. The supreme court shall have exclusive jurisdiction over all matters relating to the contest and may issue appropriate orders to all election authorities in the area in which the contested election was held.

None of this procedure makes sense where, as here, the issue being contested is the fairness and sufficiency of a ballot title that is identical throughout the state, a matter that will be determined as a question of law, not based on facts regarding the conduct of the election in any locale. Finally, section 115.593 provides in relevant part that, "If the court or legislative body trying a contested election determines there were irregularities of sufficient magnitude to cast doubt on the validity of the initial election, it may order a

16

new election for the contested office or on the contested question." Plainly, these provisions are intended to allow inquiry into *the conduct of the election to determine whether there were irregularities that cast doubt on the result.* This is intended to be a factual inquiry to be tried to the court or legislative body. *Id.* A ballot title objection does not fit easily into this process, although it is exactly suited to a proceeding under chapter 116, which, as the principal opinion acknowledges, was adopted precisely to provide a method of determining ballot challenges.

For these reasons, the principal opinion misses the point in stating that a hearing was held here, there just was no evidence introduced, but there could have been. To the contrary, evidence as to the conduct of the election would have been irrelevant. The only question is a legal one, whether the ballot title contains a fair and sufficient summary of the proposed amendment. To say that evidence could have been offered as to whether individual voters were misled, when the question of the sufficiency of the title under chapter 116 is a legal not a factual one so that evidence would be irrelevant, just magnifies the inappropriateness of reliance on chapter 115 when judging the sufficiency of a ballot title.

The principal opinion seeks to avoid the inapplicability of these provisions to ballot title challenges by noting that section 116.020 provides that elections as to state ballot measures shall be held as procedurally provided in chapter 115 – except, of course, those regarding timing and location of filing of the election contest, which apparently do not apply because if they did the filing would be untimely.

17

Certainly it is correct that, were there irregularities in the holding of the election on the amendment to article I, section 23, those irregularities would be tried to see if they conflicted with the law governing elections as set out in section 115. But, of course, nothing in section 115 addresses ballot titles, nor does chapter 115 incorporate chapter 116. Consequentially, the statement that election irregularities in the trial of ballot issues can be tried under chapter 115 begs rather than answers the question of what is an election irregularity.

The principal opinion also cites to the fact that Missouri courts have considered violations of election statutes as irregularities under chapter 115, citing *Gerrard v. Bd. of Election Comm'rs, 913 S.W.2d 88, 89 (Mo. App 1995)*, and *Marre v. Reed, 775 S.W.2d 951 (Mo. banc 1989).* But each of these cases involved challenges to elections because of failures to comply with the procedures governing the holding of the election involved. *Marre* involved a challenge to the qualifications of voters, while *Gerrard* involved an alleged improper attempt to use public funds to influence an election and an allegedly confusing organization of the ballot itself. *See id.* Neither was a ballot title challenge. Citation to these cases simply highlights the lack of authority for addressing a ballot title challenge under chapter 115.

Finally, the principal opinion says that nothing in chapter 116 says that the validity of a ballot title cannot be determined under chapter 115 too, so it must be permissible. But more on point would be a reference to the long-recognized adage that, in interpreting statutes, the specific will govern over the general. *Greenbriar Hills Country Club v. Dir. of Revenue, 935 S.W.2d 36, 38 (Mo. banc 1996).* Here, specific procedures for ballot

18

challenges are set out in detail in chapter 116. There would be little point in so providing if the legislature really meant "or you can just use any other chapter addressing elections, we are not particular." In fact, the principal opinion recognizes that it must utilize the standard set out in chapter 116 in determining the election contest here filed under chapter 115, for otherwise there would be no guide as to how to determine whether a ballot title was "irregular." It, therefore, basically incorporates chapter 116 into chapter 115 by reference. But, if the legislature so intended, it would have so provided.

Luckily, the legislature can itself correct the problems created by the principal opinion's holding by revising chapter 116 to state explicitly that a person may not bring a challenge to ballot title language after an election under chapter 115, and that unfairness or insufficiency of a ballot title is not an election irregularity. Were it not to so clarify the law, one can only imagine the multitude of post-election attacks on ballot titles of amendments adopted by the people, such as that first brought post-election in *Shoemyer v. Kandar, -- S.W.3d -- (Mo. banc 2015) (No. SC94516)*. It was entirely understandable for the petitioners in *Shoemyer* to bring that challenge, for this Court invited such post-election filings by its dicta in *Dotson I*. But this is bad public policy. It would, in future cases, encourage those who oppose an amendment, and who see insufficiencies in the ballot title, to "sandbag" the election by delaying their challenge until after the election. If the proposition loses, they will have saved their resources. If it passes, they can just bring their challenge after the election and achieve the same result. The result is that insufficiencies or unfairness in a ballot title that previously might have been identified

19

and corrected prior to an election will go unchanged, and the people's vote may be unnecessarily negated.

Challengers who failed to timely bring a pre-election challenge under chapter 116 and section 116.190 should not be allowed a "second bite at the apple" by bringing an after-election challenge under chapter 115.

### B.    *Application of Law of the Case*

This does not leave persons such as petitioners without a remedy.  When a citizen has timely filed a challenge to a ballot title under chapter 116, the fact that there was insufficient time to determine whether the ballot language was fair and sufficient prior to the six week deadline for changing ballot language simply makes moot the attempt to change the ballot language prior to the election.  But it does not render moot the argument that the ballot language is unfair or insufficient.  In other words, it affects only the remedy.  The determination of the sufficiency of the ballot title can continue during the six week period and thereafter.  If the court determines that the language used in the ballot title was unfair or insufficient, and the ballot proposition passes, then the election result must be invalidated.

This is the same remedy that the principal opinion applies under chapter 115.  But it does so by unnecessary broadening of the meaning of "irregularity" in chapter 115 and then incorporating chapter 116 into chapter 115 when there is no reason or statutory authority to do so.  The matter can simply be resolved by continuing to decide the ballot title sufficiency and fairness issue even after the passage of the six-week deadline.  To the extent that *Dotson I* dicta says otherwise, I would disavow it.

20

This would not leave these petitioners without a remedy here, even though this Court already dismissed their prior action rather than simply continuing to consider its challenge to the ballot title under chapter 116. Rather, I would apply law of the case principles to state that, in reliance on this Court's dismissal of their prior action and invitation to these petitioners to instead file an election contest, this case may be considered on its merits as if brought under chapter 116 and would reach the merits.

For the reasons stated in part I of my separate opinion, I find that the petitioners' challenge to the ballot title is without merit because the changes that are not included in the ballot title can be narrowly interpreted so as not to change the law governing the right to bear arms. So as not to invalidate the people's adoption of the amendment, I would so interpret the amendment.

_____

**LAURA DENVIR STITH, JUDGE**

# SUPREME COURT OF MISSOURI
# en banc

D. SAMUEL DOTSON III                    )
AND REBECCA MORGAN,                      )
                                        )
                    Plaintiffs,         )
                                        )
vs.                                     )     No. SC94482
                                        )
MISSOURI SECRETARY OF STATE             )
JASON KANDER,                           )
                                        )
                    Defendant,          )
                                        )
TOM DEMPSEY, TIMOTHY JONES,             )
RON RICHARD, KURT SCHAEFFER,            )
AND MISSOURIANS PROTECTING              )
THE 2ND AMENDMENT,                      )
                                        )
                    Intervenors.        )

## OPINION DISSENTING IN PART AND CONCURRING IN PART

I respectfully dissent from the principal opinion to the extent it holds that the summary statement of the ballot title fairly and sufficiently informed Missouri voters of the legal and probable effects of SJR 36. The principal opinion reaches this conclusion even though the summary omits any reference to any of the specific, substantive changes to the state constitutional right to keep and bear arms. By omitting the substance of SJR

36, the summary amounted to little more than an electoral sleight of hand. As a matter of law, Missouri voters deserve better.

A summary statement must "state the consequences of the initiative without bias, prejudice, deception, or favoritism." *Brown v. Carnahan*, 370 S.W.3d 637, 654 (Mo. banc 2012). While the summary must accurately and fairly reflect the "legal and probable effects" of the initiative, it need not include every detail. *Id*. at 654. Requiring an accurate and fair summary serves the dual purposes of (1) promoting "an informed understanding by the people of the probable effects of the proposed amendment" and (2) preventing special interests from "imposing [their] will upon the people without their full realization of the effects of the amendment." *Id*. at 654, quoting *Buchanan v. Kirkpatrick*, 615 S.W.2d 6, 11-12 (Mo. banc 1981). If the voters are to have an "informed understanding" and the ability to cast their vote with "full realization of the effects of the amendment," the summary must include some reference to the substantive, consequential provisions in the proposed constitutional amendment.

The summary in this case posed to Missouri voters the following question:

> Shall the Missouri Constitution be amended to include a
> declaration that the right to keep and bear arms is a [sic]
> unalienable right and that the state government is obligated to
> uphold that right?

A reasonable voter reviewing this ballot title would conclude that a "yes" vote would amend the Missouri Constitution to include declarations that: (1) the right to keep and bear arms is unalienable, and (2) the state government is obligated to uphold that right.

2

What may not be immediately apparent, however, is that neither of these declarations creates any practically important substantive change to the state constitutional right to keep and bear arms. The declaration that the right to bear arms is "unalienable" is repetitive of the already existing language in article I, section 23 providing that the right to keep and bear arms "shall not be questioned." Including this declaration has no discernible legal or practical effect on the right to keep and bear arms. Further, informing voters that the proposed amendment includes a declaration that the state government is "obligated to uphold" the right to keep and bear arms as amended simply begs the question of how the right to keep and bear arms is being amended. The fact that this declaration is essentially content-free is further illustrated by the fact that this declaration is nothing more than an express statement of the corollary to every individual constitutional right; that is, the government must not violate individual rights and is instituted in part as a vehicle to uphold those rights. *See* Mo Const., art. I, sec. 2.[1]

If the constitutional changes proposed by SJR 36 were indeed as limited and inconsequential as indicated by the summary, then the summary would fairly apprise voters of the legal and probable consequences of their vote. The problem is that a

---

1 Article I, section 2 provides:

> That all constitutional government is intended to promote the general welfare of the people; that all persons have a natural right to life, liberty, the pursuit of happiness and the enjoyment of the gains of their own industry; that all persons are created equal and are entitled to equal rights and opportunity under the law; that to give security to these things is the principal office of government, and that when government does not confer this security, it fails in its chief design.

3

cursory review of SJR 36, the sole purpose of which is to *amend* the constitutional rights of every citizen of this State, reveals sweeping substantive changes that are as obvious as they were absent from the summary statement.

1. Strict Scrutiny

   SJR 36 proposed to amend article I, section 23 by providing expressly that any restriction on the rights protected by article I, section 23 shall be subject to "strict scrutiny." The phrase "strict scrutiny" has a long-established, precise meaning in constitutional law. Strict scrutiny means that any governmental regulation of a fundamental right must be narrowly tailored to meet a compelling state interest. *See San Antonio Independent School Dist. v. Rodriguez*, 411 U.S. 1, 17 (1973); *State v. Young*, 362 S.W.3d 386, 397 (Mo. banc 2012). Here, the unmistakable plain language meaning of the term "strict scrutiny" is that, for the first time in Missouri history, any attempt to regulate guns, ammunition or accessories is presumptively invalid and will be declared unconstitutional unless it is narrowly tailored to serve a compelling government interest. *See Ocello v. Koster*, 354 S.W.3d 187, 200 (Mo. banc 2011) (citing *Pleasant Grove City v. Summum*, 555 U.S. 460, 467 (2009) (when strict scrutiny applies, legislation is presumptively invalid). Instead of crafting pages of justifications for concluding that strict scrutiny does not mean strict scrutiny, I would simply hold fast to the basic principle that "the constitution means what it says" even if that result is inconvenient or controversial. *See State ex rel. City of Ellisville v. St. Louis County Bd. of Election Com'rs* 877 S.W.2d 620, 623 (Mo. banc 1994) (citing *Gramex Corporation v. Von Romer*, 603 S.W.2d 521, 526 (Mo. banc 1980)).

4

Despite the fact that SJR 36 proposed to amend the Missouri Constitution to include the precise and unambiguous term "strict scrutiny," the principal opinion holds that voters did not need to be informed of this change to their constitution because the amendment did not change Missouri law and, instead, simply updated article I, section 23 to be consistent with federal law. If the effect of SJR 36 is simply to update the Missouri Constitution to be consistent with Second Amendment, then SJR 36 is superfluous because, as a matter of law, the state constitutional right to bear arms has to be consistent with the Second Amendment. To save SJR 36, the principal opinion reduces it to the status of a substantively meaningless, wholly unnecessary and purely symbolic editorial exercise. If SJR 36 is simply an update and, therefore, has no practical or legal effect, then the summary statement is deficient not because it failed to apprise voters of the substance of SJR 36 but because it affirmatively misled Missouri voters into believing they were voting on a substantive constitutional amendment aimed at strengthening the state constitutional right to keep and bear arms.

The plain language of SJR 36 demonstrates that it is more than a meaningless and unnecessary update. The principal opinion first asserts that there is no settled analysis under federal law or Missouri law defining a particular level of judicial scrutiny regarding firearms regulations. That is true. As the principal opinion notes, neither *District of Columbia v. Heller,* 554 U.S. 570 (2008), nor *McDonald v. Chicago*, 561 U.S. 742 (2010), defined a particular level of scrutiny and both cases reaffirmed the legislative prerogative to regulate firearms. Similarly, there is no settled analysis in Missouri regarding the applicable standard of review of firearms regulations. The plain language

5

of SJR 36 resolved that ambiguity by expressly requiring that courts are required to apply "strict scrutiny" to any regulation of the right to keep and bear arms. The plain language of SJR 36 means that "historically accepted" regulatory authority cited by the principal opinion is just that – history, unless, as the principal opinion reasons, specifically amending the constitution to require strict scrutiny actually amends nothing and has no "legal or probable" effect.

The principal opinion further downplays the significance of amending the constitution to require strict scrutiny by asserting that this new provision does not change the law affecting the right to bear arms and, instead, simply established an undefined "broader guideline" for judicial review of firearms regulations. This rationale has at least two fatal flaws.

First, as established above, the term "strict scrutiny" means exactly what it says. The requirement that courts invalidate firearms regulations that are not narrowly tailored to compelling state interests directly affects the right to keep and bear arms because it is an essential component of the very definition of the scope of the right. From a practical standpoint, the rights enjoyed by Missouri gun owners are defined in large part by the constitutional limitations on the state's regulatory efforts as decided by this Court pursuant to this Court's exclusive jurisdiction to determine the validity of state statutes. *See* Mo. Const., art. V, sec. 3. There is no doubt that one of the "legal and probable effects" of the new constitutional requirement of strict scrutiny is that efforts to regulate guns, ammunition and accessories are more likely to be declared unconstitutional than before. This directly affects the right to keep and bear arms, and voters should have been

6

informed of this change to their state constitution.

Second, even if the principal opinion is correct that the term "strict scrutiny" does not mean strict scrutiny, an underlying premise of the principal opinion is the recognition that SJR 36 establishes a new and undefined "broader guideline" for judicial review of firearms regulation. By recognizing that SJR 36 establishes a new broader guideline for judicial review of firearms regulations, the principal opinion is acknowledging that SJR 36 requires that firearms regulations must be subjected to some level of judicial scrutiny that is different from what was required prior to the amendment. By acknowledging a change in the level of scrutiny, the principal opinion is, for the reasons noted above, implicitly acknowledging that the requirement of "strict scrutiny" will have a direct effect on Missourians' right to keep and bear arms.

2. Concealed Weapons

Even more striking than the new requirement of strict scrutiny, SJR 36 eliminated the century-old constitutional provision stating that the right to keep and bear arms does "not justify the wearing of concealed weapons." By deleting the only express textual limitation on the individual right to keep and bear arms, the obvious legal and probable effect of SJR 36 is that, at the very least, it is now an open question as to whether Missouri citizens have a state constitutional right to wear concealed weapons. Once again, the summary statement failed to inform voters of this change.

The principal opinion and Judge Stith's separate opinion attempt to avoid this conclusion by relying on *Brooks v. State*, 128 S.W.3d 844, 847 (Mo. banc 2004). Both opinions assert that *Brooks* held that the clause in the former version of article I, section

7

23, providing that the right to bear arms "shall not justify the wearing of concealed weapons," neither conferred nor removed a right to carry concealed weapons and, instead, simply clarified that article I, section 23 was not intended to affect the legislature's authority to regulate the carrying of concealed weapons. Both opinions then reason that, because SJR 36 deleted the concealed weapons clause, the amended version of article I, section 23 likewise neither confers nor takes away any right to carry concealed weapons. Consequently, both opinions conclude that the specific deletion of the concealed weapons clause had absolutely no effect on the legislature's power to regulate concealed weapons.

The issue in *Brooks* was whether the concealed weapons statute was unconstitutional based on the now-deleted clause providing that the right to keep and bear arms "shall not justify the wearing of concealed weapons." This Court held that the concealed weapons statute was not unconstitutional because:

> There is no constitutional prohibition against the wearing of concealed weapons; there is only a prohibition against invoking the right to keep and bear arms to justify the wearing of concealed weapons. ***Consequently***, the General Assembly, which has plenary power to enact legislation on any subject in the absence of a constitutional prohibition, *Board of Educ. of City of St. Louis v. City of St. Louis*, 879 S.W.2d 530, 533 (Mo. banc 1994), has the final say in the use and regulation of concealed weapons. (Emphasis added).

*Brooks*, 128 S.W.3d at 847.

*Brooks* reasoned that the clause providing that the right to bear arms did not "justify the wearing of concealed weapons" meant "simply that the constitutional right does not extend to the carrying of concealed weapons, not that citizens are prohibited

8

from doing so, or that the General Assembly is prohibited from enacting statutes allowing or disallowing the practice." *Brooks*, 128 S.W.3d at 847. The legal effect of the now-deleted concealed weapons clause amounted to a "prohibition against invoking the right to keep and bear arms to justify the wearing of concealed weapons." *Id.* In other words, an individual could not justify wearing concealed weapons by invoking his or her right to keep and bear arms. "Consequently," the General Assembly retained its plenary regulatory power with respect to concealed weapons. *Id.*

The flaw in the principal opinion's analysis is that SJR 36 specifically deleted the clause providing "this shall not justify the wearing of concealed weapons" and, therefore, specifically deleted the only textual "prohibition against invoking the right to keep and bear arms to justify the wearing of concealed weapons." *See Brooks*, 128 S.W.3d at 847. Following the rationale of *Brooks* demonstrates that the specific deletion of this prohibition means that article I, section 23 no longer bars Missourians from invoking the right to keep and bear arms to justify their choice to wear concealed weapons. Put simply, Missourians can now invoke the right to keep and bear arms to justify the wearing of concealed weapons. While the exact parameters of this right remain unresolved, this expansion of individual liberty necessarily restricts the permissible range of the General Assembly's regulatory authority with respect to concealed weapons.

Finally, the principal opinion attempts to avoid this conclusion by reasoning that the deletion of this century-old limitation on the right to keep and bear arms has no substantive effect because the "legislature continues to have the authority to regulate concealed weapons." The fact that the legislature continues to have the authority to

9

regulate concealed weapons is irrelevant to the issue of whether deleting the concealed weapons limitation has constitutional significance. Every constitutional right, even the foundational and jealously protected constitutional rights to speech and assembly, religion and property, are all subject to varying degrees of legislative regulation. Therefore, the fact that the legislature retains regulatory authority over concealed weapons is simply an observation of the obvious. Equally obvious, but conveniently omitted from the summary statement, is the fact that, by specifically deleting the concealed weapons limitation, SJR 36 substantively amended the state constitutional right to keep and bear arms by allowing Missourians to invoke their right to keep and bear arms to justify the wearing of concealed weapons.

3. Felons and Firearms

SJR 36 also expressly amended the article I, section 23 to provide that "[n]othing in this section shall be construed to prevent the general assembly from enacting general laws which limit the rights of **convicted *violent* felons** …." (Emphasis added). By expressly reaffirming regulatory authority with respect to convicted violent felons while conspicuously declining to reaffirm regulatory authority with respect to convicted nonviolent felons, the obvious implication is that, for the first time in state history, article I, section 23 places convicted nonviolent felons on the same plane as lifelong law-abiding citizens when it comes to regulating the right to keep and bear arms. The legal and probable effect of this language is that a felon who is deemed nonviolent, a drug trafficker, for instance, now has the same individual state constitutional right to keep and

10

bear arms as any other lifelong law-abiding citizen.[2]   In fact, this legal and probable

effect is already evident, as there have been several recent instances in which circuit

judges have dismissed a felon-in-possession-of-a-firearm charge on grounds that the

statute is unconstitutional when applied to nonviolent felons.  The summary statement did

not in any way inform Missouri voters of this specific, substantive amendment to their

state constitutional right to keep and bear arms.

4.  Ammunition and Accessories

SJR 36 provided for the first time in state history that every Missouri citizen

would enjoy an express state constitutional right to "ammunition and accessories typical

---

[2] Judge Stith's separate opinion asserts that the foregoing rationale is incorrect in "suggesting that the failure of article I, section 23, as amended, to mention the right to regulate non-violent felons means that the amendment removed from the legislature its traditional authority to regulate the possession of weapons by all felons or those with mental conditions that make them a danger to themselves or others."  First, nothing in this rationale suggests article I, section 23 imposes new limits on regulatory authority regarding the gun rights of violent felons or dangerous, mentally ill individuals.  The plain language of the amended version of article I, section 23 provides otherwise.  Second, by framing the issue as "the failure of article, I section 23 … to mention the right to regulate nonviolent felons," the separate opinion assumes that the amended version of article I, section 23 retains the General Assembly's traditional regulatory authority over the possession of firearms by all felons but simply forgot to mention it.  If the Missouri Constitution means what it says, then the most reasonable interpretation of the specific inclusion of new language expressly retaining plenary regulatory authority over "violent" felons only is that "nonviolent" felons are no longer subject to the same level of regulatory oversight as violent felons.  Third, the fact that the United States Supreme Court has reaffirmed regulatory authority over firearms has nothing to do with the actual language in the amended version of article I, section 23 and overlooks well-established precedent holding that the Missouri Constitution can extend greater constitutional protections than those provided in the United States Constitution.  If the amendments in SJR 36 were intended to simply update the Missouri Constitution to be consistent with the United States Supreme Court's interpretation of the Second Amendment, SJR 36 could have simply provided that "article I, section 23 shall be construed in the same manner as the Second Amendment to the United States Constitution."  Instead, the plain language of SJR 36 purports to extend greater constitutional protections to Missourians than those required by the Second Amendment by either *Heller* or *McDonald*.  That is precisely what the plain language of the SJR 36 does, and that is precisely what the ballot summary failed to include.

to the normal function of such arms …." The principal opinion concludes that Missouri voters did not need to be informed of this change to their constitution because the dictionary definition of the word "arms" is a "means of offense or defense: WEAPON." According to the principal opinion, this definition of the word "arms" means that the preexisting right to bear arms "could" have already included ammunition and firearms accessories. Aside from the fact that this definition refers to a "weapon" and not to ammunition or accessories for a weapon, the fact remains that SJR 36 specifically and unequivocally provides an express constitutional right to ammunition and firearms accessories. If the principal opinion is correct and the Missouri Constitution "could" have already included the right to ammunition and accessories, then the issue of an individual right to ammunition and accessories was previously an open question. SJR 36, however, definitively answered that question by amending the Missouri Constitution to include an express individual constitutional right to ammunition and accessories. The summary statement failed to inform voters of this substantive constitutional change in any way.

The inescapable logic of the principal opinion is that although SJR 36 purported to amend the state constitutional right to keep and bear arms by expressly adding new rights and specifically deleting long-standing limitations on that right, SJR 36 is a constitutional amendment that, for all practical purposes, amended nothing. Rather than saving SJR 36 by holding that it was largely meaningless, the simple and accurate resolution of this case requires only that this Court recognize that the summary statement failed to advise Missouri voters of a single one of the substantive changes proposed in the plain language

12

of SJR 36. The total failure of the summary statement to include any discernible reference to a single one of the several substantive changes to article I, section 23 cannot be squared with the requirement that summary statements provide voters with an "informed understanding" and "full realization of the effects of the amendment." *See Brown*, 370 S.W.3d at 654. I would hold that the summary statement was so deficient that it constituted an election irregularity under chapter 115, RSMo.

_____

Richard B. Teitelman